UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| SCOTT STEWART, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DEBORAH W. STEWART,<br><br>    Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, NATIONAL ASSOCIATION<br><br>    Defendant. | Case No.: 5:15-cv-00988-MHH |

## MEMORANDUM OPINION

Plaintiff Scott Stewart, as the representative for the estate of Deborah W. Stewart, brings this action against Wells Fargo. (Doc. 1). Mr. Stewart contends that Wells Fargo terminated Ms. Stewart's employment in violation of the Family Medical Leave Act of 1993, 29 U.S.C. §§ 2601, *et seq*. (Doc. 1).[1] Wells Fargo argues that it terminated Ms. Stewart's employment for poor performance. (Doc. 29). The parties have presented evidence in support of their respective positions.

---

[1] On September 16, 2015, after filing this action, Ms. Stewart died. (Doc. 34, pp. 15–16; Doc. 17). Pursuant to Federal Rule of Civil Procedure 25(a)(1), if a deceased plaintiff's action survives the plaintiff, then the decedent's successor or representative may file a motion for substitution within 90 days after service of the statement noting death. On December 21, 2015, within the 90-day window proscribed by Rule 25, Ms. Stewart's personal representative, Scott Stewart, filed a motion to substitute himself as plaintiff. (Doc. 21). The Court granted the motion. (Doc. 23).

1

On this record, pursuant to Federal Rule of Civil Procedure 56, Wells Fargo asks the Court to enter judgment in favor of the company. (Doc. 29). Mr. Stewart asks the Court to strike various statements made in evidentiary materials that Wells Fargo submitted. (Doc. 41). Wells Fargo has also moved to strike Mr. Stewart's declaration. (Doc. 44). For the reasons discussed below, the Court denies Wells Fargo's motion for summary judgment and the Court denies both Mr. Stewart's and Wells Fargo's motions to strike as moot.

## I.     SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party. *See White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

Accordingly, the Court presents the facts in this opinion in the light most favorable to Mr. Stewart. *See White*, 789 F.3d at 1191; *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("[W]hen conflicts arise between the facts evidenced by the parties, [courts] must credit the nonmoving party's version."). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## II. FACTUAL BACKGROUND

On March 5, 2012, Wells Fargo hired Ms. Stewart to serve as a treasury management sales consultant. (Doc. 32-3, pp. 1–2; Doc. 32, p. 48). Several team members interviewed Ms. Stewart and selected her from a field of candidates because she had decades of industry experience, including some prior experience with Wells Fargo. (Doc. 32, pp. 18–21; Doc. 33, p. 16–17). Ms. Stewart's supervisor, Jason Kincaid, Senior Vice President of Treasury Management, was "excited" and "impressed" to have Ms. Stewart on his team. (Doc. 32, pp. 23–24). Mr. Kincaid was not the sole decision-maker in hiring determinations, but he made the ultimate decision in terminating employees on his team. (Doc. 32, p. 86; Doc. 33, pp. 19–21, 23).

As a treasury management sales consultant, Ms. Stewart developed and maintained business for an assigned customer base in north Alabama and

Tennessee. (Doc. 30-1, ¶ 6; Doc. 30-2, ¶ 6; Doc. 32, p. 16). According to Wells Fargo, Ms. Stewart's responsibilities included:

> partnering with Bank relationship managers and business bankers in a consultative selling role, meeting annual sales goals and sales activity targets by developing and executing a strategy to retain and fully penetrate existing client relationships, develop sales plans for her assigned territory and key customer accounts, providing training on treasury management products and services to relationship managers and business bankers as needed, and managing her assigned territory with minimal oversight from management.

(Doc. 30-1, ¶ 6; Doc. 30-2, ¶ 6).

At the end of her first year at Wells Fargo, Ms. Stewart did not meet her sales goal. (Doc. 30-4, p. 2–4; Doc. 30-5, p. 2; Doc. 1, ¶ 10). Mr. Kincaid testified that "it's not uncommon in the first year [as a treasury management sales consultant] . . . to [have to] build up your pipeline, build up your relationships and partnerships, and then the sales performance comes from that." (Doc. 32, p. 51). In addition to falling short of her annual sales goals, according to her annual performance evaluation, Ms. Stewart underperformed in other areas of her work in 2012. (Doc. 30-4, p. 2–4; Doc. 32, pp. 64, 74). Mr. Kincaid expressed concern in the review about Ms. Stewart's achievement and set future performance expectations. (Doc. 30-4, p. 3; Doc. 32, pp. 64–65). Mr. Kincaid recognized that Ms. Stewart had "faced market headwinds with a low starting pipeline, high bank turnover and new BBG leadership." (Doc. 30-4, p. 3). Mr. Kincaid also noted that Ms. Stewart "ha[d] worked very hard." (Doc. 30-4, p. 2; Doc. 30-2, p. 7). Despite

4

Wells Fargo's allegations of Ms. Stewart's poor 2012 performance, Wells Fargo rated her overall evaluation performance for 2012 a "3." (Doc. 30-4, p. 2–4).[2] Not only that, Wells Fargo gave Ms. Stewart an end-of-the-year performance bonus. (Doc. 32, pp. 52–55).

During the first quarter of 2013, according to Wells Fargo, Ms. Stewart's performance worsened; Mr. Kincaid testified he received "more complaints from bankers . . . [and] clients" about Ms. Stewart's work. (Doc. 32, pp. 64–66, 102–03). In April 2013, Ms. Stewart's sales were 32 percent of her year-to-date goal and 11 percent of her annual goal. (Doc. 30-7, p. 2). Wells Fargo issued Ms. Stewart an informal warning for her underperformance. (Doc. 32-8). Mr. Kincaid testified that "it's not uncommon" for a treasury management sales consultant to receive an informal performance warning. (Doc. 32, p. 47). The informal review set out an improvement plan to help Ms. Stewart achieve her benchmark standards. (Doc. 30-7, pp. 2–3).

In the months that followed, Wells Fargo contends that Ms. Stewart's performance did not improve. (Doc. 30-2, ¶ 8). On June 26, 2013, Wells Fargo issued a formal performance warning to Ms. Stewart which stated that failure to improve would result in "further corrective action, up to and including termination

---

[2] The grading scale that Wells Fargo used to assess Ms. Stewart's performance is not in the record. The Court infers that a "3" is toward the top of the scale and that Ms. Stewart "met expectations."

5

of employment." (Doc. 30-2, ¶ 8; Doc. 30-10, pp. 2–4). Mr. Kincaid testified he "drove the process" to place Ms. Stewart on formal warning and Mr. James Walsh, Wells Fargo's Southeast Division Sales Manager to whom Mr. Kincaid reported, was simply made aware of Mr. Kincaid's decision. (Doc. 32, p. 110). While Mr. Kincaid conducted monthly one-on-one meetings with his team members, after Ms. Stewart was placed on a formal performance warning, Mr. Kincaid moved to weekly one-on-one meetings with her. (Doc. 32, p. 71).

One week before Ms. Stewart received the formal warning, she visited her doctor for treatment of chronic neck pain. (Doc. 43-7, p. 4). Scott Stewart, Ms. Stewart's son, testified that Ms. Stewart had complained about her neck troubles for years. (Doc. 34, p. 16). Her doctor diagnosed myelopathy, and Ms. Stewart and her doctor agreed that she should have surgery. The doctor ordered a pre-surgical diagnostic CT and prescribed medicine for Ms. Stewart. (Doc. 43-7, p. 4). When Mr. Kincaid discussed the formal warning with Ms. Stewart, she asked if she was about to be terminated and explained that she was having health issues that she needed to resolve. (Doc. 32, pp. 70-71).

At some point during the performance warning process, probably in May or June of 2103, Mr. Kincaid asked Ms. Stewart if she was looking for another job. (Doc. 32, pp. 74-76). Mr. Kincaid testified he "actively talk[ed] with Miss Stewart about trying to help her find a place she could succeed" because "[w]hen [he]

6

see[s] someone not performing . . . [it] create[s] a lot of concern for [him]." (Doc. 32, pp. 74, 76). ). On July 8, 2013, Wells Fargo gave Ms. Stewart a mid-year performance review. Wells Fargo told Ms. Stewart that she was "Off Track" in every category of work. (Doc. 30-11, p. 2; Doc. 40-1, p. 1).

In July 9, 2013, Wells Fargo received Ms. Stewart's request for medical leave for neck surgery. (Doc. 30-12, p. 2). On July 10, 2013, Wells Fargo granted Ms. Stewart's request. (Doc. 30-12, p. 2). Wells Fargo's Leave Management team informed Mr. Kincaid that Ms. Stewart's "leave of absence qualifies for job protection under the Family and Medical Leave Act." (Doc. 30-12, p. 9). Mr. Kincaid testified that he was "not really familiar" with FMLA leave because he was "on the front line." (Doc. 32, p. 71). Ms. Stewart had neck surgery and was on leave for five weeks from July 19, 2013 to August 26, 2013. (Doc. 30-2, ¶ 20; Doc. 30-12, p. 2; Doc. 30-13, p. 2).

On August 26, 2013, Ms. Stewart returned to Wells Fargo, and Mr. Kincaid allowed her to work with limited responsibilities for two weeks. (Doc. 30-14, p. 2). Mr. Kincaid testified that he informed Ms. Stewart that he "assum[ed] [she] probably [was] not going to be 200 percent coming back" after her surgery because he understood she "had gone through a procedure, had been on leave, and . . . needed some time to try to ramp back up." (Doc. 32, p. 81). Mr. Kincaid stated he

7

warned Ms. Stewart that she was still "close to being terminated," regardless of her medical issues or leave. (Doc. 32, pp. 81, 84–85).

When Ms. Stewart resumed her regular duties, Mr. Kincaid determined that "there was really nothing Miss Stewart was doing to indicate there was a path for success." (Doc. 32, p. 83). On October 2, 2013, just weeks after Ms. Stewart returned to work from medical leave, Mr. Kincaid, in an e-mail to human resources and Mr. Walsh, stated: "I am writing to express my continued concern for Debby Stewart's performance level in her role as a TMSC. I believe we need to move to termination as soon as possible for several reasons." (Doc. 40-1, p. 1). Mr. Kincaid provided a number of performance-based explanations and added that termination was justified because "Debby submits a request for medical leave." (Doc. 40-1, p. 1). Mr. Walsh replied, "I fully support Jason's determination that we move to termination." (Doc. 40-1, p. 1).

On October 9, 2013, five weeks after Ms. Stewart's return to work from her FMLA leave, Mr. Kincaid terminated her employment "for continued poor performance." (Doc. 30-1, ¶ 7; Doc. 30-2, ¶ 8). Wells Fargo acknowledges that other treasury management sales consultants who reported to Mr. Walsh and Mr. Kincaid had failed to meet their annual sales goals but had not been terminated. (Doc. 30-1, ¶ 10; Doc. 30-2, ¶ 10). Mr. Kincaid testified that "[t]oward the end of

[Ms. Stewart's] tenure in the role, [he did not] believe she was trying . . . to succeed." (Doc. 32, p. 79).

Mr. Stewart, who works in finance, testified that Ms. Stewart, as a single mother raising him, had throughout her career "worked from the smallest bank to the biggest bank" and had "always [been] a top performer." (Doc. 34, p. 36). Wells Fargo replaced Ms. Stewart with Nicole Burgess, who Wells Fargo acknowledges "was a junior person, did not have the level of experience Miss Stewart had," and "did not have experience in treasury management sales." (Doc. 32, pp. 73, 99). After Wells Fargo terminated Ms. Stewart, Ms. Stewart filed for disability benefits and never worked again. (Doc. 34, p. 66–67). Mr. Stewart observed the "stress that [losing her job at Wells Fargo]" in a "very unjust" manner had "put on her." (Doc. 34, p. 36). On September 16, 2015, three months after filing this action, Ms. Stewart died unexpectedly after suffering a heart attack. (Doc. 34, pp. 15–16).

## III. ANALYSIS

Mr. Stewart argues Wells Fargo violated the FMLA by terminating Ms. Stewart's employment because she requested medical leave from work. (Doc. 1). The FMLA guarantees to eligible employees the right to twelve weeks of leave during any twelve-month period due to a serious health condition. *See* 29 U.S.C. § 2612(a)(1). To state a claim for FMLA retaliation, Mr. Stewart "must show that

9

[Wells Fargo] *intentionally* discriminated against [Ms. Stewart] for exercising an FMLA right." *Martin v. Brevard Cnty. Pub. Sch.*, 543 F.3d 1261, 1267 (11th Cir. 2008) (emphasis in original). In this circuit, a plaintiff may prove retaliation under the FMLA through direct or circumstantial evidence of discrimination. *See Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001); *see also Dockens v. DeKalb Cnty. Sch. Sys.*, 441 Fed. Appx. 704, 708 (11th Cir. 2011).

Direct evidence is "evidence, which if believed, proves the existence of a fact without inference or presumption." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (quotation omitted). Evidence that merely suggests retaliation, *see Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081–82 (11th Cir. 1990), or that could "have more than one possible meaning," *see Harris v. Shelby Cnty. Bd. of Educ.*, 99 F.3d 1078, 1083 n. 2 (11th Cir. 1996), is circumstantial evidence. *See Merritt*, 120 F.3d at 1189.

At the summary judgment stage, even if the factual predicate for the direct evidence is disputed, if "a jury could find that the decisionmaker had made the statement, there [is] direct evidence . . . precluding summary judgment." *Bass v. Bd. of Cnty. Comm'rs, Orange Cnty., Fla.*, 256 F.3d 1095, 1112 (11th Cir. 2001); *see also Merritt*, 120 F.3d at 1189 ("'Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary

10

judgment is not appropriate even where the movant presents conflicting evidence.'") (quoting *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742 (11th Cir. 1996)).

In *Merritt*, the Eleventh Circuit discussed "a long line of cases" in which it "found direct evidence where 'actions or statements of an employer reflect[] a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Id.* at 1189–90 (alteration in original) (quoting *Caban–Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir.1990)) (collecting cases). "The quintessential example of direct evidence" in an age discrimination case is "'a management memorandum saying, "Fire Earley—he is too old."'" *Id.* at 1190 (quoting *Earley*, 907 F.2d, at 1081). Similarly, in a race retaliation case, the quintessential example of direct evidence is, "Fire Merritt—he gave the most damning deposition testimony" in a Title VII lawsuit. *Id.*

In this case, Mr. Stewart has established his prima facie case through direct evidence. On October 2, 2013, in an e-mail to human resources and Mr. Walsh, Mr. Kincaid stated, "I believe we need to move to termination as soon as possible for several reasons[.]" (40-1, p. 1). One of those reasons was: "Debby submits a request for medical leave." (Doc. 40-1, pp. 1). Mr. Walsh replied to Mr. Kincaid's e-mail, reporting, "I fully support Jason's determination that we move to termination." (Doc. 40, p. 1). On October 9, 2013, five weeks after Ms.

11

Stewart returned from FMLA leave, Mr. Kincaid terminated Ms. Stewart's employment. (Doc. 30-1, p. 4).

Mr. Kincaid's e-mail constitutes direct evidence of retaliation. Mr. Kincaid's statement that "I believe we need to move forward on termination" because "Debby submit[ted] a request for medical leave" does more than merely suggest a discriminatory motive. It is a blatant remark.

Wells Fargo argues that it is entitled to summary judgment because the company terminated Ms. Stewart for poor performance.[3] Wells Fargo's argument fails because Mr. Stewart has produced direct evidence to support his claim. As a result, the burden of persuasion does not shift to Wells Fargo to "rebut this type of showing of [retaliation] simply by articulating or producing evidence of legitimate, nondiscriminatory reasons" for terminating Ms. Stewart. *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 774 (11th Cir. 1982).[4] Instead, Mr. Stewart's claim

---

[3] Wells Fargo argues that Mr. Stewart should have to demonstrate that, "but for" Ms. Stewart's FMLA leave request, Wells Fargo would not have terminated her. The Court is not persuaded. Neither the Supreme Court nor the Eleventh Circuit requires plaintiffs bringing FMLA retaliation claims to prove causation under the "but for" standard. The Eleventh Circuit applies the "motivating factor" causation standard in FMLA retaliation cases. *See Pereda v. Brookdale Senior Living Communities, Inc.*, 666 F.3d 1269, 1275 (11th Cir. 2012); *Smith v. BellSouth Telecomms., Inc.*, 273 F.3d 1303, 1313 (11th Cir. 2001). As the Eleventh Circuit recently observed, "in the FMLA context, neither the Supreme Court nor [the Eleventh Circuit] has required plaintiffs to prove that illegal retaliation was the 'but-for' cause of the adverse employment action suffered." *Coleman v. Redmond Park Hosp., LLC*, 589 Fed. Appx. 436, 438 (11th Cir. 2014).

[4] Because the Court finds that Mr. Stewart has established his prima facie case of FMLA retaliation through direct evidence, the Court does not have to evaluate his circumstantial evidence to rule on Wells Fargo's summary judgment motion. The Court notes that the Eleventh

12

survives summary judgment and proceeds directly to a jury. At the summary judgment stage, in the face of direct evidence of retaliation, a jury—not this Court—must decide whether Wells Fargo terminated Ms. Stewart in violation of the FMLA. *See Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010) (vacating summary judgment and explaining that the plaintiff's evidence of discriminatory remarks "should be taken at face value" and to conclude otherwise "would be to deny Plaintiff the benefit of resolving all reasonable inferences in her favor as the nonmoving party.").

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Wells Fargo's motion for summary judgment. (Doc. 29). Because the Court did not rely on the disputed material in reaching its decision, it **DENIES** both Mr. Stewart's and Wells Fargo's motions to strike as **MOOT**. (Docs. 41, 44).

---

Circuit analyzes FMLA retaliation claims using the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Hulbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). Under this test, in the absence of direct evidence, a plaintiff can establish a prima facie case of FMLA retaliation with circumstantial evidence by proving: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment decision; and (3) the decision was causally related to the protected activity. *Id*. If the employee makes this showing, "the burden then shifts to the defendant to articulate a legitimate reason for the adverse action." Finally, "[i]f the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." *Id*. The Court recognizes that in addition to direct evidence, Mr. Stewart has presented some circumstantial evidence of retaliation in violation of the FMLA.

**DONE** and **ORDERED** this March 14, 2017.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE